**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 29, 2009

No. 08-30637

Charles R. Fulbruge III
Clerk

CEDRIC FLOYD

Plaintiff - Appellant

v.

CITY OF KENNER, Louisiana; NICK A CONGEMI, Former Chief of Police, City of Kenner, Louisiana, Individually and in his official capacity; STEVE CARAWAY, Chief of Police, City of Kenner, Individually and in his official capacity; MICHAEL CUNNINGHAM, Police Officer, Kenner Police Department, Individually and in his official capacity; CLIFF DEROCHE, Police Officer, Kenner Police Department, Individually and in his official capacity

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:06-CV-6414

Before REAVLEY, WIENER, and SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Cedric Floyd brought civil rights claims against the City of Kenner, Louisiana. and four of its police officers. The district court dismissed Floyd's suit after determining that he failed to state claims upon which relief could be

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

granted. For the reasons that follow, we affirm the district court's judgment in part and reverse it in part.

## I. BACKGROUND

This case arose out of the relief effort that followed Hurricane Katrina. As Kenner's chief administrative officer, Floyd was charged with overseeing a center that distributed food and supplies. The center operated during the month of September 2005 and was patrolled both by National Guardsmen and Kenner policemen.

Floyd maintains that he occasionally delivered supplies to individuals who could not reach the center during normal hours of operation. He would load the supplies and take them away from the center. Those activities, juxtaposed with charges that Floyd misappropriated supplies, are key to this dispute.

Floyd contends that Kenner's mayor once directed him to deliver items to a local apartment complex. Upon arriving at the complex, he says he was confronted by then-Chief of Police Nick Congemi. Floyd claims that Congemi saw him as a political nemesis because Floyd helped derail Congemi's earlier bid for mayor. At the apartment complex, Floyd claims that Congemi became "flustered, embarrassed, and angry" due to their verbal exchange.

Within one business day of the confrontation, National Guardsmen from the center complained that Floyd was illegally distributing some supplies. Later that same day, one of the National Guardsmen who lodged the complaint was patrolling the neighborhood where Floyd lived. With him was Officer Cliff Deroche. Deroche alleges that they heard Floyd's house alarm go off. They then allegedly went onto Floyd's property and saw relief items in plain view. They reported the discovery to a Kenner police detective, Michael Cunningham. He then used the information as a basis to file an affidavit in support of search and arrest warrants. Steve Caraway, the then-chief of investigations, is said to have approved Cunningham's filing.

A search warrant was issued and executed. Kenner police seized relief supplies from Floyd's home. Floyd was arrested for malfeasance in office but never prosecuted.

Floyd subsequently filed a pro se civil rights action against the City of Kenner, as well as Caraway, Congemi, Cunningham, and Deroche, both in their individual and official capacities. Less than four months later, Floyd obtained counsel. An amendment was filed which named additional defendants.[1] He maintains that the Defendants "were all part of [an] effort to illegally search his residence and falsely arrest him for theft/malfeasance" and that it was all "motivated by the political animus" that Congemi had towards him.

The Defendants filed a motion to dismiss, arguing that Floyd failed to allege facts sufficient to defeat qualified immunity. Before ruling on the motion, the district court ordered Floyd to file a reply in order to "provide 'greater detail' and [to] assist the Court in deciding whether qualified immunity is proper given the specific facts and allegations raised in [Floyd]'s [c]omplaint." After evaluating the response, the district court dismissed Floyd's claims with prejudice. Floyd's appeal followed.

## II. DISCUSSION

We review a Rule 12(b)(6) dismissal *de novo*. *Ballard v. Wall*, 413 F.3d 510, 514 (5th Cir. 2005). To survive a motion to dismiss, a plaintiff is required to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

---

[1] The amended complaint added numerous National Guardsmen as defendants, but Floyd later dismissed these individuals from the lawsuit.

Caraway, Congemi, Cunningham, and Deroche have asserted a qualified immunity defense. In reviewing those claims, we are guided both by the ordinary pleading standard and by a heightened one.[2] *See Schultea v. Wood*, 47 F.3d 1427, 1433-34 (5th Cir. 1995) (en banc). *Schultea* explained that, once a defendant asserts the defense of qualified immunity, a district court may order the plaintiff to submit a reply after evaluating the complaint under the ordinary pleading standard. *Id.* We held that more than mere conclusions must be alleged, stating specifically that "a plaintiff cannot be allowed to rest on general characterizations, but must speak to the factual particulars of the alleged actions, at least when those facts are known to the plaintiff and are not peculiarly within the knowledge of defendants." *Id.* at 1432. "Heightened pleading requires allegations of fact focusing specifically on the conduct of the individual who caused the plaintiff's injury." *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999).

Floyd's complaint alleged that the district court had jurisdiction under 42 U.S.C. §§ 1983, 1985, and 1986. Floyd's complaint and *Schultea* reply make no other reference to Sections 1985 or 1986. Instead, under his "Statement of Claim," Floyd focused solely on Section 1983. On appeal, Floyd makes only two very general references to Sections 1985 and 1986. He never attempts to set forth what those claims require or how he would satisfy such requirements. A party waives arguments that are not adequately briefed. *United States v.*

---

[2] We emphasize that this heightened pleading standard applies only to claims against public officials in their individual capacities. The Supreme Court's decision in *Leatherman v. Tarrant County Narcotics and Intelligence Coordination Unit*, 507 U.S. 163 (1993), made clear that a heightened pleading standard was inapplicable to suits against municipalities. Further, the heightened standard is inapplicable to claims against public officials in their official capacity, for we have "explained that official-capacity lawsuits are typically an alternative means of pleading an action against the governmental entity involved . . . ." *Baker v. Putnal*, 75 F.3d 190, 195 (5th Cir. 1996).

*Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989). Accordingly, we will consider the possibility of Section 1983 liability only.

To plead a Section 1983 claim, Floyd was required to allege facts demonstrating that (1) a defendant violated the Constitution or federal law and (2) that he or she was acting under color of state law while doing so. *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 252-53 (5th Cir. 2005). The qualified immunity defense to such claims, which applies here only to the claims against the four officers in their individual capacities, works to shield government officials from liability when they are performing discretionary functions, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Once a defendant invokes the qualified immunity defense, the plaintiff carries the burden of demonstrating its inapplicability. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). To satisfy the burden, a plaintiff must meet a two-prong test. *Id*. "First, he must claim that the defendants committed a constitutional violation under current law."[3] *Atteberry*, 430 F.3d at 253. "Second, he must claim that the defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Id*. "To be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 256 (citations, internal quotation marks, and alterations omitted). The objective unreasonableness inquiry requires us to examine an officer's belief that his or

---

[3] The Supreme Court recently "relaxed the requirement, established in *Saucier v. Katz*, 533 U.S. 194 (2001), that we must decide if a constitutional violation occurred *before* we decide if the law was clearly established." *Club Retro*, 568 F.3d at 194 n.4 (emphasis in original).

her actions were lawful under the particular circumstances. *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008).

We now consider Floyd's claims against each defendant.

*A.    Deroche*

The district court held that, although Floyd "may have established a possible constitutional violation," Deroche was entitled to qualified immunity because his conduct "was not objectively unreasonable in light of clearly established law." The conduct to which the district court referred was that of Deroche's entering Floyd's backyard and viewing the supplies. This information was later used to support search and arrest warrants against Floyd.

We start with an examination of the pleadings as to Deroche. The Defendants' answer stated that an unnamed officer (the record indicates it was Deroche) and a National Guardsman responded to a burglar alarm at Floyd's residence. It was "as a result of responding to the burglar alarm numerous items that appeared to have [been] misappropriated" were seen. The answer also stated that the search on the next day was based on probable cause set forth in a warrant.

In his *Schultea* reply, Floyd had to engage the allegations that supported qualified immunity. *Shultea,* 47 F.3d at 1433-34. Floyd stated in the reply that Deroche was dispatched for the specific purpose of entering the property "in an effort to secure any means with which to embarrass Floyd, and then falsely assert[] in an affidavit submitted to a neutral magistrate that the entry had been in response to a burglar alarm." Floyd alleges that the alarm company's records "reflect that the type of alarm which sounded . . . is that which occurs when someone tests the door by jiggling the knob" and further contends that the alarm company's records "reflect notification that police were on the scene within one minute of the initial record of the alarm."

6

The reasonable inferences that can be drawn from these statements are that Deroche either intentionally set the alarm off after entering Floyd's property in order to provide an excuse for being on the premises, or Deroche unintentionally set the alarm off while on the premises, then used it as subterfuge. The *Schultea* reply directly challenges the claim that the alarm created the probable cause for Deroche to go to Floyd's residence.

The Defendants move beyond the point and counterpoint of the pleadings and claim that Deroche's conduct must "be examined against the backdrop of circumstances that have never before existed in this country and which hopefully will never come to pass again." Even if Floyd's allegations are accepted as true, the Defendants argue, Deroche's actions must be considered in light of the exigent circumstances at play, particularly the "chaos and lawlessness that followed in the wake of Hurricane Katrina and the necessity of insuring that the vast amounts of donated goods reached those for whom [they were] intended, rather than being misappropriated for the individual profit of the undeserving."

We disagree. The complaint and the *Schultea* reply alleges that Deroche took advantage of chaotic times in a troubled city as a screen for going to Floyd's residence to further the malicious schemes of a political antagonist. There may be no supportive evidence. But the claim exists. It is presented with sufficient clarity under our pleading rules to survive dismissal. Hurricane Katrina is an explanation for many events. It is not a justification for intentional acts of the sort that Floyd claims.

We note that, even beyond the pleadings, an exhibit to the Defendants' motion to dismiss is the September 20 application for a search warrant. It asserts that a National Guardsman and Deroche claimed to have gone to Floyd's residence in response to a burglar alarm. An affidavit by Detective Cunningham, made three days after the search, made the same assertion. Clearly, concerns about Floyd's possible misappropriation of relief supplies were

not asserted as the reason for Deroche's trip to Floyd's residence. Instead, it was the burglar alarm. Floyd's reply to the qualified immunity defense engages that explanation sufficiently.

In *Schultea*, we adopted the rationale that, "in some cases, such as in search cases, probable cause and exigent circumstances will often turn on facts peculiarly within the knowledge of the defendants. And if there are conflicts in the allegations regarding the actions taken by the police officers, discovery may be necessary." *Schultea*, 47 F.3d at 1432 (citing *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)). Here, the Defendants ask us to accept that Deroche entered the property for the sole purpose of determining if relief items were present. At the time, Deroche alleged he entered because of the alarm. Floyd asserts that Deroche knew that Floyd was not misappropriating relief items; instead, the entry into the property was all about embarrassing Floyd because of his past run-ins with then-Chief of Police Congemi.

This is the type of conflict that warrants discovery. The district court should not have dismissed the claim.

## B.    Cunningham

Officer Cunningham was the affiant who applied for the search and arrest warrants that were issued against Floyd. The central thrust of Floyd's claim against Cunningham is that both warrant applications contained false statements and omitted information that would have undermined the validity of the warrants.
The district court held that Floyd did not set forth sufficient facts to allege a constitutional violation.

Like the claim against Deroche, the alleged constitutional violation against Cunningham is of the Fourth Amendment. The Supreme Court has held that, if an affiant "knowingly and intentionally, or with reckless disregard for the truth," includes a false statement in an affidavit, and without that false

allegation probable cause would have been lacking, "the Fourth Amendment requires that . . . the search warrant must be voided and the fruits of the search excluded. . . ." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (also discussing proper hearing procedures). We have held that "the intentional or reckless omission of material facts from a warrant application may amount to a Fourth Amendment violation." *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006).

From these articulations, it becomes clear that state of mind is a critical element of the underlying constitutional violation. Our case law acknowledges that the Supreme Court has "held that the public official's state of mind [is] *generally* no longer relevant in deciding a claim of qualified immunity." *Tompkins v. Vickers*, 26 F.3d 603, 607 (5th Cir. 1994) (emphasis added) (discussing *Harlow*, 457 U.S. 800). Nonetheless, we have explained that "motive or intent must be considered in the qualified immunity analysis where unlawful motivation or intent is a critical element of the alleged constitutional violation." *Id*. This is one of those claims; namely, that an affiant intentionally acted by way of an omission in order to cause a constitutional violation.

Floyd has consistently alleged that Cunningham acted at the direction of then-Chief of Police Congemi, who is said to hold political animus towards Floyd. At a later stage, Floyd will be required to "produce specific support for his claim of unconstitutional motive." *Id*. at 608. But at the pleading stage, his allegation that Cunningham's actions were spurred by Congemi's ill will suffices.

To be sure, certain portions of Floyd's *Schultea* reply are insufficient to state a plausible claim. Floyd, for example, averred that Cunningham's affidavit contained "statements of which he had no personal knowledge" that were "sworn to by him in reckless disregard of the truth." The Supreme Court emphasized in *Iqbal* that such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." 129 S. Ct. at 1949.

9

But viewed in their entirety, Floyd's pleadings contain more. The *Schultea* reply points out that Cunningham's affidavit stated that Floyd was observed loading supplies in a City of Kenner truck on September 19, 2005, at the center, which is located at 2500 Williams Boulevard. Cunningham's affidavit also stated that the items seen in plain view by Deroche at Floyd's home "were identical to the ones observed on the bed of the City of Kenner truck" at the center on September 19. Floyd's pleadings allege that Cunningham knew this statement to be false because the center was relocated from 2500 Williams Boulevard on September 17 and 18, so a City of Kenner truck certainly was not present at 2500 Williams Boulevard on September 19. Floyd further alleges that Cunningham knew Floyd was the managing supervisor of the center and that he possessed "full authority to handle[,] dispose and deliver all hurricane supples." It is said that Cunningham nonetheless left this relevant if not critical information out of his affidavit in order to mislead the magistrate.

Taken as true, these facts are sufficient at least to survive Rule 12(b)(6) dismissal. Floyd's complaint alleges, with factual specificity, the type of harm that was found unconstitutional in *Franks*. Accordingly, the alleged violation was "clearly established" at the time Cunningham acted. In addition, Cunningham's alleged intentional actions were not objectively reasonable. We therefore reverse the district court's dismissal of the claims against Cunningham.

## C.    *Caraway*

The allegations against Caraway are twofold. First, Floyd alleges that Caraway "participated in, approved and directed the application for Arrest and Search warrants based upon the assertion of facts he knew to be false, resulting in the false arrest of Plaintiff Cedric Floyd without probable cause . . . ." At the time the applications were filed, Caraway served as the police department's chief of investigations. Second, Floyd avers that, to date, Caraway has failed to return

the items seized from his home, even though the district attorney directed that the items be returned. Of particular relevance to this allegation is the fact that Caraway now serves as Kenner's chief of police and thus presumably controls the release of the items.

We first review the allegations with respect to the warrant applications. Floyd does not complain that Caraway himself filed the alleged unlawful affidavit in support of the warrants. Instead, he claims that Caraway, in his capacity as chief investigator, directed and approved the applications filed by Cunningham. This is an alleged Fourth Amendment violation under *Franks*, as we stated in addressing the claim against Cunningham.

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 129 S. Ct. at 1948. Liability under Section 1983 for a supervisor may exist based either on personal involvement in the constitutional deprivation or "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987).

We must determine whether Floyd alleged the "factual particulars" necessary to state a valid Fourth Amendment claim against Caraway. *See Schultea*, 47 F.3d at 1432. The relevant allegation is that Caraway "participated in, approved and directed" the filing of false and misleading affidavits.

In analyzing the issue, we turn to the Supreme Court's recent decision in *Iqbal*. 129 S. Ct. 1937. There, a Pakistani man detained following the September 11, 2001 terrorist attacks alleged that former Attorney General John Ashcroft and FBI Director Robert Mueller authorized an unconstitutional detention policy. *Id.* at 1942. To state a cognizable claim, the plaintiff was required to "plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative

reason but for the purpose of discriminating on account of race, religion, or national origin." *Id.* at 1948-49. The Supreme Court described the factual matter contained in the complaint:

> The complaint contends that petitioners designated respondent a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." It further alleges that "[t]he policy of holding post-September-11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race and/or national origin and for no legitimate penological interest." The pleading names Ashcroft as the 'principal architect' of the policy, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation."

*Id.* at 1944 (citations omitted).

After considering these factual particulars, the Court held that the plaintiff had not "nudged his claims . . . across the line from conceivable to plausible." *Id.* at 1950-51 (quoting *Twombly*, 127 S. Ct. at 1974). They were bare assertions, without detail or context. *See id.* One might speculate, and the plaintiff there apparently did, that the actions and knowledge he alleged were true. *See id.* It is clear, though, that in the arena of qualified immunity (but surely not solely in this arena), discovery is not the place to determine if one's speculations might actually be well-founded. Consistent with our holding in *Schultea*, the pleadings must have sufficient precision and factual detail to reveal that more than guesswork is behind the allegation. *Schultea*, 47 F.3d at 1434.

Certainly our precedents have acknowledged that some limited discovery may at times be needed before a ruling on immunity is proper. As an example, we referred to "search cases, [because] probable cause and exigent circumstances will often turn on facts peculiarly within the knowledge of the defendants." *Id.* at 1432. In such a case, "if there are conflicts in the allegations regarding the actions taken by the police officers, discovery may be necessary." *Id.*

The importance of discovery in such a situation is not to allow the plaintiff to discover if his or her pure speculations were true, for pure speculation is not a basis on which pleadings may be filed. Rule 11 requires that any factual statements be supported by evidence known to the pleader, or, when specifically so identified, "will *likely* have evidentiary support" after discovery. Fed. R. Civ. P. 11(b)(3) (emphasis added). There has to be more underlying a complaint than a hope that events happened in a certain way. Instead, in the "short and plain" claim against a public official, "a plaintiff must at least chart a factual path to the defeat of the defendant's immunity, free of conclusion." *Schultea*, 47 F.3d at 1430. Once that path has been charted with something more than conclusory statements, limited discovery might be allowed to fill in the remaining detail necessary to comply with *Schultea*. *Id.* at 1433-34.

Under these standards, Floyd's allegations against Caraway amount to nothing more than speculation. The conclusory assertion that Caraway "participated in, approved and directed" the filing of false and misleading affidavits is consistent with finding a constitutional violation, but it needed further factual amplification. *See Iqbal*, 129 S. Ct. at 1949. Floyd might not know everything about what occurred, but the bare allegation does not make it plausible that he knows anything. Unlike his allegations against Cunningham, this bare assertion does not provide any detail about what Caraway, as chief of investigations, did to seek to control Cunningham's filing of an affidavit. Put

differently, the conclusion presents nothing more than hope and a prayer for relief.

An example of a situation that falls squarely within the kind of case justifying limited discovery is discussed in a recently released but non-precedential opinion by a panel of this court. *Morgan v. Hubert*, No. 08-30388, 2009 WL 1884605 (5th Cir. July 1, 2009). In *Morgan*, a plaintiff who was in protective custody before Hurricane Katrina was transferred to a general prison population following the storm. *Id*. at *1. After being beaten and stabbed, the plaintiff filed a Section 1983 suit against the prison warden. *Id*. The complaint presented sufficient detail to demonstrate a highly plausible allegation of an Eighth Amendment violation. *Id*. at *6. The events cited were so clear, the practical effects of such conduct so obvious, that the defendants' responsibility under Section 1983 for the plaintiff's harm simply needed the detail that limited discovery would either provide or deny. *Id*.

Unlike in *Morgan*, Floyd has shown nothing in his complaint to indicate a basic plausibility to the allegation. His Section 1983 claim premised on a Fourth Amendment violation therefore fails.

Floyd also alleges that Caraway refused to return Floyd's seized property. Floyd's pleadings did not state which constitutional provision Caraway supposedly violated. The district court correctly explained that the allegations possibly fall within the realm of a Fourteenth Amendment due process claim. Even so, the district court ultimately rejected Floyd's claim after determining that the City of Kenner had procedures in place for Floyd to get his property back, that Floyd had failed to utilize those procedures, and that Floyd had failed to set forth how the procedures available "deprived him of his property rights and/or how the available procedures were inadequate."

The district court's ruling was consistent with the analysis required under the *Parratt*/*Hudson* doctrine. Under the doctrine, the "unauthorized deprivation

14

of a plaintiff's property does not result in a violation of procedural due process rights if the state provides an adequate postdeprivation remedy." *Alexander v. Ieyoub*, 62 F.3d 709, 712 (5th Cir. 1995) (citations omitted); *see also Zinermon v. Burch*, 494 U.S. 113, 128-32 (1990) (discussing the *Parratt/Hudson* doctrine). In Louisiana, the civil tort of conversion exists to rectify the type of wrong Floyd has alleged. *Fuller v. XTO Energy, Inc.*, 989 So. 2d 298, 302 (La. App. 2d Cir. 2008) ("[A] conversion consists of an act in derogation of a plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods . . . ."). Because Louisiana provides a postdeprivation remedy, relief is not available to Floyd under Section 1983. *See Alexander*, 62 F.3d at 712.

Floyd has failed to allege specific facts that constitute a deprivation of either his Fourth or Fourteenth Amendment rights. Consequently, the district court's dismissal with respect to the claims against Caraway was correct.

## D. *Congemi*

Similar to the claims against Caraway, it is alleged that then-Police Chief Congemi acted in his supervisory role to violate Floyd's constitutional rights. In particular, Floyd states that Congemi personally directed the efforts to have false and misleading affidavits filed against him and that the issuance of those affidavits, in turn, led to an unlawful search of his home and an unlawful arrest. He also maintains that Congemi attempted to persuade the district attorney to prosecute him, even though Congemi knew that he was authorized to handle the supplies found at his home.

We have already explained that Section 1983 liability for a supervisor may be based either on personal involvement in the constitutional deprivation or "a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Thompkins*, 828 F.2d at 304. The district court held that "none of the 'facts' alleged as to Congemi amount to a violation of a clearly established constitutional right."

15

We agree. Floyd has failed to provide sufficient factual detail concerning Congemi's alleged attempts at personally directing his subordinate officers to file misleading affidavits. Other than a general background of why Congemi would have animosity towards Floyd, no facts are alleged that reveal any specifics of how Congemi personally told other officers to conspire against Floyd. Moreover, Floyd's sweeping statement that Congemi attempted to persuade the district attorney to prosecute him, even though Congemi knew that Floyd was authorized to handle the supplies, does not shed further light on the subject. The claims against Congemi lack the detail needed to render them plausible. *See Iqbal*, 129 S. Ct. at 1949. Accordingly, they were appropriately dismissed.

E.    *City of Kenner*

Finally, we consider the district court's dismissal of the City of Kenner. "[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "It is well established that governmental liability under § 1983 must be premised on a government policy or custom that causes the alleged constitutional deprivation." *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 436 (5th Cir. 2008). Floyd has alleged no facts that would support an inference that the police officers acted pursuant to a policy or custom.

The district court appropriately dismissed the City.

III.    CONCLUSION

We AFFIRM the district court's dismissal with respect to Floyd's claims against the City of Kenner and Officers Caraway and Congemi. We REVERSE the district court's dismissal of the individual capacity claims against Officers Cunningham and Deroche.