# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 18, 2025

Lyle W. Cayce
Clerk

_____

No. 23-30103

_____

Julie Nevarez, *Individually, and on behalf of her minor children*, B.N., M.N., and G.N.; De'Andre Willis,

*Plaintiffs—Appellees*,

*versus*

Anthony Dorris; Justin Leonard,

*Defendants—Appellants*.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:21-CV-1855

_____

Before Graves, Higginson, and Ho, *Circuit Judges*.

Stephen A. Higginson, *Circuit Judge*:

In this action, plaintiff-appellee Julie Nevarez seeks relief under 42 U.S.C. § 1983 based on allegedly unconstitutional searches performed by Louisiana State Police ("LSP") Troopers Justin Leonard and Anthony Dorris (collectively, "the Troopers"). Mrs. Nevarez's claim arises out of the fatal shooting of her husband, Miguel Nevarez, in their front yard by officers from the Houma Police Department ("HPD") and the Terrebonne Parish Sheriff's Office ("TPSO"). Days after Mr. Nevarez was killed, the Troopers sought and obtained search warrants for the home, the car in which Mr.

No. 23-30103

Nevarez was sitting in his driveway when the officers first approached him, and Mrs. Nevarez's cell phone, stating that they were investigating the crime of aggravated assault against a police officer by Mr. Nevarez. Mrs. Nevarez alleges this justification was pretextual, as the Troopers were investigating whether the policemen who killed Mr. Nevarez had used excessive force in doing so, and the affidavits they submitted to secure the warrants lacked probable cause.

The district court denied the Troopers' third motion to dismiss, concluding they were not entitled to qualified immunity. We are obliged to RE-VERSE and REMAND.

## I.

We set forth below the factual and procedural background of this appeal.[1]

## A.

On the evening of October 13, 2020, an HPD officer responded to reports of gunshots in Mr. Nevarez's neighborhood. The HPD officer approached Mr. Nevarez, who was parked in his own driveway, and asked Mr. Nevarez to step out of the car. When Mr. Nevarez refused, the officer "drew his service weapon and called for backup." Within minutes and based solely on this interaction with Mr. Nevarez, HPD blocked off the surrounding streets and dispatched an armored truck and nearly fifty officers from HPD and TPSO. When Mrs. Nevarez arrived, she was denied access to her street.

---

[1] We take the facts from the operative second amended complaint because, at this stage, "we accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Armadillo Hotel Grp., L.L.C. v. Harris*, 84 F.4th 623, 628 (5th Cir. 2023) (cleaned up).

No. 23-30103

Shortly thereafter, Mrs. Nevarez's cell phone rang with a call from Mr. Nevarez, but an HPD officer seized her phone before she could answer it.

When Mr. Nevarez eventually exited his vehicle, he ran toward his house and away from the police officers flanking the front of the house. The Troopers reported that as Mr. Nevarez circled the house and was confronted by police officers, he "allegedly raised a gun towards [an HPD officer]," prompting that officer to fire back and prompting several of his fellow officers to follow suit.[2] They shot Mr. Nevarez almost twenty times and he died in his front yard.

After the incident, HPD asked LSP to investigate the officer-involved shooting.[3] As part of this investigation, on October 14, 2020, Trooper Leonard secured a search warrant for the Nevarez home and the vehicle Mr. Nevarez had been in before he was subsequently shot. In his affidavit supporting the search warrant, Leonard certified that probable cause existed for the searches because the car and house contained evidence of "aggravated assault upon a peace officer" in violation of "LRS 14:37.2." Specifically, Leonard's search warrant sought

> [a]ny and all weapons to include firearms, ammunition, items pertaining to weapons and/or ammunition, video surveillance recording devices, electronic devices that may store messages and/or video, handwritten notes and/or any and all evidence

---

[2] Plaintiffs dispute the Troopers' assertion that Mr. Nevarez "possessed a gun while actively fleeing law enforcement officers."

[3] As the second amended complaint highlights, LSP is under a federal "pattern or practice" investigation because the U.S. Department of Justice has found "significant justification to investigate" whether "LSP uses excessive force and whether it engages in racially discriminatory policing." U.S. ATT'Y'S OFF., MIDDLE DIST. OF LA., *Justice Department Announces Investigation of Louisiana State Police* (June 9, 2022), https://www.justice.gov/usao-mdla/pr/justice-department-announces-investigation-louisiana-state-police [https://perma.cc/V7X8-XZVF].

pertaining to the shooting. Also requested in this search warrant is the curtilage within the property to include the white Mitsubishi sedan.

On October 19, 2020, five days after Mr. Nevarez's death, Trooper Dorris secured a search warrant for Mrs. Nevarez's cell phone, which was seized on the night of her husband's death. Dorris submitted an affidavit in which he likewise swore that the warrant was needed "to locate any and all evidence that may aid [LSP] in their active investigation of the crime of LRS 14:37.2 Aggravated Assault Upon a Peace Officer." Specifically, Dorris's search warrant sought the following:

1. Any voice messages, text message, phone numbers, pictures, GPS, and other electronic data and or media contained within the hardware, or cellular operating system of the cellular phone that identifies the owner and or possessor of the cellular phone.

2. Any and all voice messages, text messages, phone numbers, pictures, GPS, and other electronic data and or media contained within the hardware, software, and or microprocessors of the cellular phone related to the below listed crimes.

3. Any Voice messages, text message, phone numbers, pictures, GPS, and other electronic data and or media contained within the Mini Secure Digital (MiniSD), MultiMedia Card Mobile (MMCmobile), or any other types of card slots support removable memory cards or specialized peripherals, such as an SDIO Wi-Fi card and or cellular operating system related to the below listed crimes.

4. Any photographs, text messages, phone logs, or GPS information located within the internal memory of the cellular phone related to the below listed crimes.

5. Any and all hidden, erased, compressed, password protected, and/or encrypted files as they relate to the below listed crimes.

6. Photographs of the interior and exterior of the cellular phone[.]

7. DNA swabs both interior and exterior of the cellular phone[.]

8. Latent prints of both interior and exterior of the cellular phone[.]

9. Any and all voice messages, text message, phone numbers, pictures, GPS, and other electronic data and or media contained within Wireless communications such as infrared (i.e., IrDA) or Bluetooth that may be built in the device related to the below listed crimes.

10. Personal Information Management (PIM) applications that includes phonebook and date book facilities, and a means to synchronize PIM information with a desktop computer.

As the district court explained, both warrant affidavits included the same description of the facts:

> They explain that on October 13, 2020, police officers approached Mr. Nevarez when responding to a complaint of a person illegally discharging a weapon. At the time, Mr. Nevarez was in a car parked in a driveway. The police unsuccessfully attempted to negotiate with Mr. Nevarez, who eventually fled the vehicle. The officers attempted to subdue Mr. Nevarez with "less lethal attempts" before they ultimately "responded to the threat" of Mr. Nevarez raising a firearm toward the police officers by "discharg[ing] their weapons," after which Mr. Nevarez, who "was struck," "succumbed to his injuries." Both affidavits indicate that the police were investigating the felony of aggravated assault upon a peace officer.

Neither affidavit mentioned that LSP was tasked with investigating the officer-involved shooting.

**B.**

In October 2021, Mrs. Nevarez and Mr. Nevarez's children (collectively, "Plaintiffs") sued several HPD and TPSO officers, the records custodians for LSP and the Terrebonne Parish Consolidated Government ("TPCG"), and Troopers Leonard and Dorris. The complaint alleged unreasonable searches and seizure in violation of the Fourth Amendment, wrongful death, excessive force, battery, assault, and violations of Louisiana Public Records Law. The Troopers filed two motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The district court resolved both motions in July 2022. The court denied the Troopers' first motion to dismiss in part on the merits and in part on the grounds of mootness, but granted the second motion to dismiss with leave to amend.

Plaintiffs subsequently filed the live pleading, their second amended complaint. The Troopers filed a third motion to dismiss in which they argued that the second amended complaint contained no new allegations that warranted revisiting the district court's conclusion in its July 2022 order.

After briefing on the motion was completed, the district court requested supplemental briefing on the question of "whether the Fourth Amendment permits law enforcement officers to seek a warrant to investigate a crime for which the alleged perpetrator cannot be convicted because the alleged perpetrator whose conduct was the focus of the warrant was dead at the time the warrant was sought."

In January 2023, the district court denied the Troopers' third motion to dismiss. The court acknowledged that "[t]he parties have identified no binding cases, nor is this [c]ourt aware of any, that squarely addresses the question of whether probable cause can support a warrant to search for

evidence of a crime that cannot be prosecuted because the suspect has died." Nonetheless, the court held that Plaintiffs plausibly alleged a claim under *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986), concluding that—because (1) Mr. Nevarez was deceased, and the affidavits (2) do not include any information that suggests that others may have been involved with the alleged assault on a peace officer, (3) do not indicate that the crime could be ongoing, and (4) were obtained because the Troopers were investigating their own use of force rather than pursuing an active criminal investigation for aggravated assault on a peace officer as they claimed—a reasonable officer would understand there was no probable cause to support the search warrants.

The Troopers timely appealed, on an interlocutory basis, the denial of qualified immunity.[4]

## II.

Under the collateral-order doctrine, we have jurisdiction on interlocutory appeal to review de novo the district court's denial of qualified immunity. *Ramirez v. Escajeda*, 921 F.3d 497, 500 (5th Cir. 2019). Our review is limited only to "determinations of questions of law and legal issues"; we will not "consider the correctness of the plaintiff's version of the facts." *Id.* (citation omitted).

In reviewing the complaint, we "draw all inferences in favor of the nonmoving party, and view all facts and inferences in the light most favorable to the nonmoving party." *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017) (citation omitted). Where, as here, the motion to dismiss asserts a qualified-immunity defense, the plaintiff "must plead specific facts that both allow the

---

[4] During the pendency of this appeal, on August 8, 2023, the district court stayed all discovery. *Nevarez v. Coleman*, No. CV 21-1855, 2023 WL 5034645 (E.D. La. Aug. 8, 2023).

court to draw the reasonable inference that the defendant is liable for the harm alleged and that defeat a qualified immunity defense with equal specificity." *Id.* (citation and alteration omitted). To defeat a qualified-immunity defense, the plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks and citation omitted).

### III.

In the second amended complaint, Plaintiffs allege that Troopers Leonard and Dorris are liable under § 1983 because they "knowingly and intentionally submitted affidavits containing false or insufficient factual statements and material omissions to procure the search warrants" of Mrs. Nevarez's cell phone, house, and car. The qualified-immunity analysis contains two prongs, which we can consider in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). We do not reach the merits of whether Plaintiffs have alleged "a violation of a constitutional right." *Buehler v. Dear*, 27 F.4th 969, 982 (5th Cir. 2022) (quoting *Pearson*, 555 U.S. at 232). Instead, we address only whether that right "was 'clearly established' at the time of [the Troopers'] alleged misconduct." *Id.*

Plaintiffs bear the burden of identifying the clearly established law, and the right's contours must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Culberson v. Clay County*, 98 F.4th 281, 286 (5th Cir. 2024) (citation omitted).

The district court acknowledged that "[t]he parties have identified no binding cases, nor is this [c]ourt aware of any, that squarely addresses the question of whether probable cause can support a warrant to search for evidence of a crime that cannot be prosecuted because the suspect has died."

No. 23-30103

That ends the second-prong analysis.[5]   Although the district court cited *Coopshaw v. Figurski*, No. 06-CV-13246, 2008 WL 324103 (E.D. Mich. Feb. 6, 2008) as "instructive," an unpublished, out-of-circuit district-court case cannot provide the requisite clearly established law. *See Clarkston v. White*, 943 F.3d 988, 990 (5th Cir. 2019) ("Clearly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity.").[6]

On appeal, Plaintiffs themselves assert "that the circumstances here involved a deceased suspect is of no moment" and shift to urge *Floyd v. City*

_____

[5] Plaintiffs have not argued the alleged constitutional violation here was so "obvious" as to obviate the need for clearly established law. *See, e.g.*, *Taylor v. Riojas*, 592 U.S. 7, 8-10 & n.2 (2020) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

[6] The dissent contends that *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294 (1967), and *Malley* announce clearly established law capable of defeating qualified immunity in this dispute. Each case is insufficient for the same reason. In *White v. Pauly*, the Supreme Court "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'"  580 U.S. 73, 79 (2017) (per curiam) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011)).  Instead, "the clearly established law must be 'particularized' to the facts of the case." *Id.* at 79 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  The facts of *Hayden* and *Malley* have nothing to do with the central issue in this dispute.  To be sure, both cases contain foundational statements of law relevant to the probable cause requirement.  But even so, "'[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established.'" *Morrow v. Meachum*, 917 F.3d 870, 875 (5th Cir. 2019) (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).  Crucially, neither *Warden* nor *Malley* provide "fair notice" that when a prime, even an only, suspect dies during the commission of a crime, no investigation to secure confirming evidence—properly and carefully done through court-approved warrants, fully apprising courts that the suspect is deceased—may occur. *See Brosseau v. Haugen*, 543 U.S. 194, 599 (2004) ("Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.").  In fact, *Warden* confirmed that the Fourth Amendment, in language and purpose, does *not* distinguish between crime evidence and instrumentalities or fruits of a crime.  378 U.S. at 301.  The decision did *not* specify a probable cause deficiency, and it predated *Malley* by almost twenty years.

9

*of Kenner*, 351 F. App'x 890 (5th Cir. 2009) (per curiam) as "unpublished [but] instructive." But *Floyd* makes no mention of *Malley*. Rather, the plaintiff's pleadings in *Floyd* alleged that the "warrant applications contained false statements and omitted information that would have undermined the [warrants'] validity," which the court recognized is "the type of harm that was found unconstitutional in *Franks* [*v. Delaware*, 438 U.S. 154 (1978)]"—not in *Malley*.[7] 351 F. App'x at 895-96. And regardless, *Floyd* is not itself "controlling authority," nor does it represent "a robust consensus of persuasive authority." *Clarkston*, 943 F.3d at 990. Thus, no law clearly established the Fourth Amendment violation alleged by Plaintiffs at the time the warrants were sought, so the Troopers are entitled to qualified immunity.

\* \* \*

Although we do not opine on the merits of Plaintiffs' Fourth Amendment claim, we pause to note that if, as Plaintiffs allege, LSP and the TPCG have refused to turn over any dash-camera footage, any of the police reports or witness statements, and much of the body-worn camera footage, and if—after discovery resumes—it becomes clear that the warrants were in fact pretextual, then Plaintiffs' Fourth Amendment rights may well have

---

[7] Importantly, the Troopers' warrant affidavits fully disclosed that Mr. Nevarez was deceased. Perhaps for this reason, the district court disclaimed its prior holding that the affidavits violated *Franks*'s first prong, just as it did not deny qualified immunity on the ground that the warrants seeking evidence from the home, car, and phone lacked nexus and particularity to the alleged offense. Nevertheless, the dissent "conclude[s] that [Plaintiffs] alleged a [constitutional violation] under *Franks*, in the alternative[,]" based on a lack of "nexus between the items sought and aggravated assault on a peace officer or an officer-involved shooting." Reaching this issue is unnecessary, if not imprudent, because Plaintiffs do not press *Franks* on appeal—even as an alternative basis for affirmance—and instead expressly "focus [their] argument on a *Malley* analysis" alone. *See In re HECI Expl. Corp.*, 862 F.2d 513, 525 (5th Cir. 1988) ("A court may decline to address an argument that is not adequately briefed.").

No. 23-30103

been violated, even if current qualified-immunity doctrine requires reversal here. *See Franks*, 438 U.S. at 155-56.

## IV.

For the foregoing reasons, we REVERSE and REMAND for further proceedings consistent with this opinion.

No. 23-30103

JAMES E. GRAVES, JR., *Circuit Judge*, dissenting.

I disagree with the majority's conclusion that the plaintiff here failed to plausibly allege the violation of a clearly established constitutional right under *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986). Because the district court properly denied the motion to dismiss on the basis of qualified immunity, I would affirm. Thus, I respectfully dissent.

Around 9 p.m. on October 13, 2020, an officer with the Houma Police Department (HPD) was investigating a report of random gunshots in the general vicinity of the neighborhood where the Nevarez family lived. Miguel Nevarez (Nevarez) was sitting in his white Mitsubishi sedan backed into his own driveway when an officer approached and told him to get out of his car. Nevarez allegedly refused. The officer drew his gun, called for backup, and set in motion an action involving some 50 officers from HPD and the Terrebonne Parish Sheriff's Office (TPSO), an armored truck, and other resources, that ultimately resulted in Nevarez being riddled with bullets and dying on his own front lawn.

While Nevarez was still sitting in his car, his wife Julie was on her way home but was denied access to her street. A short time later, officers seized Julie's cell phone when Nevarez attempted to call her and refused to allow her to speak with her husband. Around 10:30 p.m., Nevarez exited his vehicle and ran away from the officers toward the back of his house inside his fenced-in yard. At this point, there was no evidence that Nevarez had done anything except allegedly refuse to get out of his own car parked in his own driveway.[1] Two officers, who were lying in wait for Nevarez outside the back fence, shot him with "less lethal" 40 mm "impact munition" rounds and

---

[1] There was no evidence that Nevarez was "in the commission of a crime," despite the majority's "fair notice" analogy.

attempted to tase him.[2]  As he attempted to run back around the front of his house, an HPD officer claimed that Nevarez suddenly raised a gun toward him, and the officer began firing.  Nevarez was promptly shot by multiple officers approximately 17 to 20 times.[3]  A then-handcuffed Nevarez died in his front yard, as officers counted his gunshot wounds rather than render aid.

HPD asked the Louisiana State Police (LSP) to investigate the officer-involved shooting.[4]  On October 14, 2020, mere hours after Nevarez was killed, Trooper Justin Leonard secured a search warrant for the Nevarez home, the white Mitsubishi and "all other structures, vehicles, and places on the premises where the thing(s) may be found" to be conducted "at any time of the day or night, including Sundays."  Leonard's sworn affidavit certified that probable cause existed for the searches "which said property," as partially quoted by the majority,[5] "constitutes evidence of the violation of Louisiana 1 Count of RS14:37.2—AGGRAVATED ASSAULT UPON A PEACE OFFICER—(FELONY) is (are) believed to be secreted or concealed."  The warrant repeated the same language.

On October 19, 2020, Trooper Anthony Dorris obtained search warrants for Julie's cell phone that had been seized the night of her husband's

---

[2] This supports the fact that there is no evidence that officers ever observed Nevarez in possession of a firearm during the extended period of time that he had been surrounded at gunpoint while sitting in his car.

[3] This was the only time anyone ever claimed to see Nevarez in possession of a firearm.  Julie also repeatedly disputes that Nevarez had a gun, despite Appellants' claim that she does not.

[4] As the majority acknowledges, the United States Department of Justice is investigating LSP for pattern or practice of excessive force and racially discriminatory policing.

[5] Leonard also sought and received authority to search "all other structures, vehicles or places on the premises" where things may be found.

death, and for the home DVR security system that was seized pursuant to the search of the house.  The majority quotes a list of some of the electronic data sought from Julie's phone, but Dorris' affidavit also said that his request was "not limited to" those items and he changed it a bit on the next two pages, where he said: "Owner/User data, Owner's phone number, SMS Messages, MMS Messages, Emails, Call History and Data, Phonebook and/or Contacts list(s), Digital photographs and/or video(s), Web browser history, geo-location data, wireless internet network data, and any other data the phone/device may contain that may aid in the investigation."  He also said that the search would likely take more than ten days and possibly weeks or months, would require searching "all the stored data to determine which particular files are evidence or instrumentalities of crime," and that it would involve recovering "even 'hidden', erased, compressed, password protected, or encrypted files" from Julie's phone.[6] Dorris' affidavit said that the search was necessary because the items sought were "believed to contain evidence of the crime(s) of: 1 Count of RS14:37.2—AGGRAVATED ASSAULT UPON A PEAC—(FELONY)."  The warrant granted both lists.

Regarding the DVR/security camera, Dorris' affidavit sought:

> Any and all electronic data contained in the computer including, but not limited to, any names, phone numbers, addresses, contact information, data, text, messages, emails, call history, calendar entries, phonebooks, ledgers, lists, notes, images, voice memos, photographs, videos, internet sites, internet access, documents or other any [sic] information or data, contained in the computer's internal, external, or removable hard drives, memory and/or storage devices, which

---

[6] There is nothing in the affidavit or warrant suggesting that Julie was engaged in any crime or that Nevarez ever had access to her phone—particularly the day he was killed by police—or that he or anyone else ever used it for any criminal purpose.  Julie had no access to her phone once authorities seized it.

include any smart cards, SIM cards, flash cards, SD cards, Micro SD cards, or any other electronic storage devices attached, connected or contained within.

Dorris' sworn affidavit certified that the warrant was needed because the items were "believed to contain evidence of the crime(s) of 1 Count of RS 14:37.2—AGGRAVATED ASSAULT UPON A PEAC—(FELONY)." But the affidavit did not specify why or offer any nexus between the items sought and aggravated assault on a peace officer. However, the affidavit did say that the search may exceed ten days. The warrant granted his request.

All of the warrant affidavits included the same alleged facts, as stated by the district court:

> They explain that on October 13, 2020, police officers approached Mr. Nevarez when responding to a complaint of a person illegally discharging a weapon. At the time, Mr. Nevarez was in a car parked in a driveway. The police unsuccessfully attempted to negotiate with Mr. Nevarez, who eventually fled the vehicle. The officers attempted to subdue Mr. Nevarez with "less lethal attempts" before they ultimately "responded to the threat" of Mr. Nevarez raising a firearm toward the police officers by "discharg[ing] their weapons," after which Mr. Nevarez, who "was struck," "succumbed to his injuries." Both affidavits indicate that the police were investigating the felony of aggravated assault upon a peace officer.[7]

None of the affidavits or warrants set out that LSP was investigating the officer-involved shooting nor provided a nexus or explanation as to how the

---

[7] The district court mentioned "[b]oth affidavits." There were actually three.

items sought would further the investigation of "aggravated assault upon a peace officer."[8]

Julie and her children (collectively "Julie") subsequently filed an action under 42 U.S.C. § 1983 against HPD, TPSO, Leonard, Dorris, and others.[9] The officers unsuccessfully moved to dismiss three different times. In the first motion, the officers asserted that Julie could not assert a § 1983 claim on behalf of a decedent, and she did not have the affidavits to support her claims. The district court granted the motion in part and denied in part on the merits and in part on the grounds of mootness. Specifically, the motion was denied as to Julie's claims asserted on her own behalf.[10]

In the second motion, the officers argued that Julie did not plead the existence of any false statements and material omissions in the search warrant affidavits, and that officers were entitled to qualified immunity because Julie confirmed that Nevarez "was alleged to have pointed a gun at a law enforcement officer," and they were investigating that action. To reiterate, Julie did not confirm that Nevarez actually possessed or pointed a gun, just that the officers alleged he did. The district court granted the second motion with leave to amend. The district court did not address whether probable cause could exist where the troopers were investigating an officer's use of

_____

[8] At oral argument, counsel for the troopers attempted to argue that the affidavits included an investigation of the officer-involved shooting. While there was a reference to the officer-involved shooting in the factual narrative, each of the affidavits repeatedly made clear that the *only* crime that was being investigated was the alleged "aggravated assault upon a peace officer."

[9] This appeal pertains to Leonard and Dorris who are collectively referred to as the "officers" or "troopers."

[10] Julie also asserted that she did not have the affidavits because the LSP had initially refused to produce them despite multiple record requests. Once they were produced, she amended her complaint and explicitly cited the affidavits.

force instead of Nevarez's supposed aggravated assault. Julie then filed a Second Amended Complaint.

The officers filed a third motion to dismiss, arguing that Julie's Second Amended Complaint contained no new allegations that warranted revisiting the district court's prior order. The district court called for supplemental briefing on "whether the Fourth Amendment permits law enforcement officers to seek a warrant to investigate a crime for which the alleged perpetrator cannot be convicted because the alleged perpetrator whose conduct was the focus of the warrant was dead at the time the warrant was sought." The district court subsequently denied the officers' third motion to dismiss. In doing so, the district court determined that Julie had plausibly alleged the violation of a clearly established constitutional right under *Malley*, 475 U.S. at 344-45. The district court also found that a reasonably well-trained officer would have known that the warrant affidavits failed to establish probable cause. Thus, the district court denied the defendants motion to dismiss on the basis of qualified immunity. The officers appealed.

*I. Standard of Review*

As the majority acknowledges, when reviewing the denial of a motion to dismiss on the basis of qualified immunity, "we must accept all facts as pleaded and construe them in the light most favorable to [Julie]." *Crane v. City of Arlington*, 50 F.4th 453, 461 (5th Cir. 2022); *see also McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017). The district court took the approach of whether the Fourth Amendment permits law enforcement officers to seek a warrant to *investigate a crime* for which the alleged perpetrator cannot be convicted because the alleged perpetrator whose conduct was the focus of the warrant was dead at the time the warrant was sought. I agree with the district court that the warrants and affidavits failed to establish probable cause for the

alleged crime of aggravated assault on a peace officer and that a reasonably well-trained officer would have known that. But I would take it a step further and conclude that, even if the officers were investigating only the officer-involved shooting, a reasonably well-trained officer would have known that the warrants and affidavits failed to establish probable cause. While I would reach the same conclusion under either approach, the latter option is more respective of the standard of review. Julie disputes that Nevarez possessed or raised a gun and argues that LSP was supposed to be investigating the officer-involved shooting. We must construe the facts in her favor. *Crane*, 50 F.4th at 461. At this motion to dismiss stage, there should be no assumption that Nevarez actually did commit aggravated assault on a peace officer or that this was a legitimate investigation.

*II. Qualified Immunity*

The majority concludes that Julie is unable to show a clearly established right under the second prong of qualified immunity. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). In doing so, the majority relies solely on the district court's statement that "[t]he parties have identified no binding cases, nor is this [c]ourt aware of any, that squarely addresses the question of whether probable cause can support a warrant to search for evidence of a crime that cannot be prosecuted because the suspect has died." The majority states "[t]hat ends the second-prong analysis."[11] I disagree, as that was not the basis for the district court's decision.

The Fourth Amendment states that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

---

[11] The majority does not reach the merits of whether Julie alleged a violation of a constitutional right under the first prong.

describing the place to be searched, and the persons or things to be seized." *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)(emphasis removed). Likewise, general warrants are prohibited by the Fourth Amendment. *Id.* This court has concluded that "[t]he law permits an affidavit incorporated by reference to amplify particularity, notwithstanding that, by its terms, the Fourth Amendment requires particularity in the warrant, not in the supporting documents." *United States v. Triplett*, 684 F.3d 500, 505 (5th Cir. 2012) (internal marks and citation omitted).

Probable cause exists "when there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of a crime." *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006) (citing *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983)). "There must, of course, be a nexus . . . between the item to be seized and criminal behavior." *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967). Such a nexus is "automatically provided in the case of fruits, instrumentalities, or contraband." *Id.* But it is well-settled law that "in the case of 'mere evidence' [of a crime], probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Id.*

While the majority briefly mentions *Malley* and *Franks v. Delaware*, 438 U.S. 154 (1978), it fails to clearly explain the significance of either case or why *Franks* is not applicable. The district court discussed both and determined that *Malley* applied. However, Julie argued both in her opposition to the motion to dismiss and raises both in her brief, while acknowledging that she focuses on *Malley* based on the district court's order.

As the district court explained:

No. 23-30103

> This court has recognized two different kinds of claims against government agents for alleged Fourth Amendment violations in connection with a search or arrest warrant: (1) claims under *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), for which the agent may be liable if he "makes a false statement knowingly and intentionally, or with reckless disregard for the truth that results in a warrant being issued without probable cause," *Michalik v. Hermann*, 422 F.3d 252, 258 n.5 (5th Cir. 2005) (discussing *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674); and (2) claims under *Malley v. Briggs*, 475 U.S. 335, 6 S.Ct. 1092, 89 L.Ed.2d 271 (1986), for which the agent may be liable if he "fil[es] an application for an arrest warrant without probable cause" and "a reasonable well-trained officer ... would have known that [the] affidavit failed to establish probable cause," *Michalik*, 422 F.3d at 259–60 (citations and internal quotation marks omitted).

*Melton v. Phillips*, 875 F.3d 256, 270 (5th Cir. 2017) (Dennis, J., dissenting); *see also Wilson v. Stroman*, 33 F.4th 202, 206 (5th Cir. 2022).

Under *Franks* liability, a Fourth Amendment violation occurs where there is "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." *Franks*, 438 U.S. at 155-56. This court has also concluded that "the intentional or reckless omission of material facts from a warrant application may amount to a Fourth Amendment violation." *Kohler*, 470 F.3d at 1113.

Under *Malley,* officers are not entitled to immunity "where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *Id.*, 475 U.S. at 344-45. This court has said that "[t]he *Malley* wrong is not the presentment of false evidence, but the obvious failure of accurately presented evidence to support

20

the probable cause required for the issuance of a warrant." *Blake v. Lambert*, 921 F.3d 215, 220 (5th Cir. 2019) (quoting *Melton*, 875 F.3d at 264). The question to be considered is whether "a reasonably well-trained officer in petitioner's position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Malley*, 475 U.S. at 345.

The majority concludes that Julie fails to allege the violation of a clearly established constitutional right. To do so, the majority necessarily has to conclude that *Malley* does not apply. But *Malley* clearly applies. The majority places inordinate emphasis on the citation of *Coopshaw v. Figurski*, No. 06-CV-13246, 2008 WL 324103 (E.D. Mich. Feb. 6, 2008). The district court did not cite an unpublished, out-of-circuit, district court case, *i.e., Coopshaw*, as clearly established law. The district court relied on *Malley v. Briggs*, 475 U.S. 335, 344-45 (1986) as the clearly established law. *Coopshaw* was only mentioned when the district court found that Julie had plausibly alleged that "law enforcement secured the warrants to uncover exculpatory evidence they could use to defend their own use of force" rather than because they had established probable cause for the warrants in connection to the alleged crime of aggravated assault on a peace officer. The district court also relied on *Kohler*, 470 F.3d at 1109, *Blake v. Lambert*, 921 F.3d 215, 221-22 (5th Cir. 2019), *Wooley v. City of Baton Rouge*, 211 F.3d 913, 919 (5th Cir. 2000), and *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967), for this finding.

Further, the district court cited *Hayden*, 387 U.S. at 307, in finding that "[i]n this case, the evidence defendants purportedly sought to uncover could not possibly 'aid in a particular apprehension or conviction.'" The full quote from *Hayden* said: "Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration

of police purposes will be required." 387 U.S. at 307. This is all clearly established law.

The majority much too narrowly construes the issue at hand and relies solely on the district court's mention that "[t]he parties have identified no binding cases, nor is this [c]ourt aware of any, that squarely addresses the question of whether probable cause can support a warrant to search for evidence of a crime that cannot be prosecuted because the suspect has died." We do not need a case squarely addressing that specific factual scenario because we already have numerous cases squarely addressing the issue of probable cause that the warrants here fail under and that the district court relied on. *See Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002) (prior cases with "notable factual distinctions" are capable of "giving fair and clear warning"); *see also Trent v. Wade*, 776 F.3d 368, 383 (5th Cir. 2015) ("A case directly on point is not required; rather, '[t]he central concept is that of 'fair warning'"); *Lytle v. Bexar County, Tex.*, 560 F.3d 404, 417 (5th Cir. 2009).[12]

The Supreme Court in *Dalia v. United States* established three conditions that must be met for searches pursuant to a warrant to be constitutional:

> First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

---

[12] Relying on quotes from *White v. Pauly*, 580 U.S. 73, 79 (2017), and *Mullenix v. Luna*, 577 U.S. 7, 12 (2015), the majority asserts that "[t]he facts of *Hayden* and *Malley* have nothing to do with the central issue in this dispute." However, as the cited cases establish, there is no requirement of a case squarely addressing the specific factual scenario.

441 U.S. 238, 255 (1979) (internal quotation marks and citations omitted).

Julie asserts that the troopers' warrants failed the second factor because the evidence they purportedly sought to uncover could not "aid in a particular apprehension or conviction." *Id.* (quoting *Hayden*, 387 U.S. at 30). Although we accord "great deference" to a magistrate judge's finding of probable cause, we will not "defer to a warrant based on an affidavit that does not 'provide the magistrate with a substantial basis for determining the existence of probable cause.'" *Kohler*, 470 F.3d at 1109 (quoting *United States v. Leon*, 468 U.S. 897, 914-15 (1984)).

The district court correctly concluded that the warrants "do not support a finding of probable cause." Nevarez was deceased, and the affidavits and/or warrants do not include any information suggesting that others may have been implicated in the alleged assault on a peace officer or that the crime could be ongoing.[13] Thus, the district court correctly held that there could be no "probable cause to believe that the evidence sought [would] aid in a particular apprehension . . . for a particular offense." *Dalia*, 441 U.S. at 255. However, I would further conclude that the warrants fail to otherwise establish probable cause.

Leonard's affidavit and the resulting search warrant for the house and car largely failed to offer a nexus between the items sought and aggravated assault on a peace officer or an officer-involved shooting. While Nevarez had been in the car shortly before he was shot, there was no claim that Nevarez was observed with anything in the car. There was also no claim that Nevarez ever entered the house or referenced the house in any way during the

_____

[13] Counsel for the troopers conceded at oral argument that the affidavits do not state the police were searching for anyone else in connection with the alleged assault on a peace officer.

encounter, that any other individual was involved in the incident, or that officers believed Nevarez had any specific evidence inside the house. The affidavit and warrant also did not explain what items Leonard believed had been "secreted or concealed" or where they were believed to be concealed, and did not reference any police report, investigation, or other information.[14] Neither the affidavit nor the warrant said anything about a belief that Nevarez owned additional weapons or explained what evidence officers believed to be contained in handwritten notes, stored messages, and/or video. There is also no mention of what is believed to be contained in all other structures and vehicles. While it is arguably understandable why officers may have wanted "video surveillance recording devices," neither the warrant nor the affidavit even says that authorities believed the house to have any kind of security or that they had observed a surveillance camera.

In the warrant for Julie's phone, the only attempt that Dorris made to offer a nexus was a statement that "[d]uring negotiations with Nevarez, his wife's cellular phone was used to make contact with him. The phone was secured as evidence after the incident." (emphasis removed). However, Julie said that shortly after she was denied access to her street, Nevarez called her, but authorities would not allow her to answer and seized her phone. This means that there is either a fact issue as to whether her phone was used to contact Nevarez or that the authorities were using her phone to speak with him without her knowledge after they seized it. If authorities were using her phone without her knowledge, then they would already know exactly what was in those "negotiations" and would not be able to establish probable cause

---

[14] Although it is doubtful that any meaningful investigation or report had been completed within a few hours.

for Julie's phone.[15]  If there is a fact issue, then it is not appropriate to prematurely grant qualified immunity—particularly where the authorities failed to establish probable cause for the warrant.

Officers wanted to go through everything in and on Julie's phone, computer, house, any surrounding structures, or cars, etc. Julie was not even allowed on her street when she tried to return home, much less on the scene. Officers seized her phone before the shooting even happened.  There is no explanation offered as to why law enforcement would need access to everything on or inside her phone, including text messages, emails, voicemails, GPS and geo-location information, photos, videos, call history, internet history, phonebook, date book, DNA, latent prints, deleted items, password protected items, etc., from any time period.  The warrant and affidavits do not establish probable cause for any of those items.  Perhaps the warrant could have established probable cause for a search of text messages, emails or voicemails between Julie and Nevarez or others on October 13, 2020, or something similar.  But there were no such constraints or particularity included.  Moreover, authorities most certainly took immediate possession of Nevarez's phone, and likely searched it.  If there was communication between Nevarez and Julie prior to his death, it would be on his phone.  To the extent that they may have possibly believed something may have been deleted from his phone or that there was a voicemail he left for her, then that should have been explained along with a request for the specific information.  There are no such explanations, limitations, or constraints on any of the items sought in the warrant.

_____

[15] I am not suggesting that this would have been proper.  Also, it is doubtful that Nevarez would have been otherwise communicating with Julie's phone if he knew that authorities were using it to negotiate, as stated in the warrant.

As for the DVR/security cameras, that evidence was seized pursuant to the house warrant, which lacked probable cause and said nothing about any belief that there were outdoor security cameras that may have captured video of the alleged crime on October 13, 2020. Also, the warrant for the DVR/security cameras then greatly expanded the parameters from potential video of the shooting to include "[a]ny and all electronic data contained in the computer including, but not limited to, any names, phone numbers, addresses, contact information, data, text, messages, emails, call history, calendar entries, phonebooks, ledgers, lists, notes, images, voice memos, photographs, videos, internet sites, internet access, documents," any other information or data, as well as any kind of external hard drive or memory storage device for any time period. But nothing in the warrant or affidavit provides probable cause or even suggests how those items might be connected to or provide evidence of the alleged crime of aggravated assault on a peace officer or the officer-involved shooting.

It is a clear violation of Julie's rights to allow authorities unfettered access to everything in or on her phone, along with searches of her house, the white Mitsubishi, all other structures and cars, the DVR and security cameras for any time period without probable cause simply because officers killed her husband, even if he allegedly raised a gun. *See Malley*, 475 U.S. at 344-45; *see also* Kohler, 470 F.3d at 1109; *Groh*, 540 U.S. at 557; *Dalia*, 441 U.S. at 255;

There is no authority for the majority to allow the violation of Julie's Fourth Amendment rights based on nothing more than the fact that law enforcement asked. The search warrants and affidavits overwhelmingly failed to establish a nexus between the items sought and the alleged crime of aggravated assault on a peace officer. They also failed to establish a nexus between the items sought and the officer-involved shooting. Moreover, they failed to include any particularity, constraints, or limitations. Hence, the plausible argument that this was nothing more than a search to find

something (anything) that might justify the use of deadly force. I am not suggesting that officers were not free to investigate either the officer-involved shooting or the alleged assault on a peace officer. I am merely saying that, under clearly established law, they needed probable cause for any warrant and could not violate Julie's rights in the process.

Julie also cites an unpublished case, *Floyd v. City of* Kenner, 351 F. App'x 890 (5th Cir. 2009) as instructive. The majority states: "[b]ut *Floyd* makes no mention of *Malley*," adding:

> Rather, the plaintiff's pleadings in *Floyd* alleged that the "warrant applications contained false statements and omitted information that would have undermined the [warrants'] validity," which the court recognized is "the type of harm that was found unconstitutional in *Franks* [*v. Delaware*, 438 U.S. 154 (1978)]"—not in *Malley*. 351 F. App'x at 895-96.

But, again, the majority fails to explain why *Franks* does not apply.[16] Also, the fact that the pleadings in *Floyd* asserted the type of harm in *Franks* but not in *Malley* should not matter since the majority concludes that *Malley* is

---

[16] The majority then cites *Franks* as authority while discussing Julie's assertions that defendants have refused to turn over any dash- or body-cam footage. In doing so, the majority states: "[A]nd if—after discovery resumes—it becomes clear that the warrants were in fact pretextual, then Plaintiffs' Fourth Amendment rights may well have been violated, even if current qualified-immunity doctrine requires reversal here. *See Franks*, 438 U.S. at 155-56." I am unable to reconcile that statement with the majority's conclusions here. The majority clearly concedes that there are factual issues that could very well establish a Fourth Amendment violation. Yet the majority maintains that "current qualified-immunity doctrine requires" a premature grant of qualified immunity before those factual issues are addressed. I disagree. Further, it is unclear what "current qualified-immunity doctrine" the majority is referencing. It cites only *Franks*, which it says is not applicable to the search warrants, but there is no discussion distinguishing *Franks* or explaining why it could support a determination of a Fourth Amendment violation later but not now.

not the clearly established law at issue here.  Further, even if Julie had not alleged a constitutional violation under *Malley*, I would conclude that she alleged one under *Franks*, in the alternative.  *See Wilson*, 33 F.4th at 206.

Because I would affirm the district court's denial of the motion to dismiss on the basis of qualified immunity, I respectfully dissent.